Opinion filed November 4, 2010

 

                                                          
In The

                                                                 


  Eleventh Court of
Appeals

                                                      
__________

 

                                            
No. 11-10-00067-CV

                                          
__________

 

    SUPERIOR ENERGY SERVICES, INC. AND
SESI, LLC, Appellants

 

                                                            
V.

 

       SONIC
PETROLEUM SERVICES, LTD. AND LONNIE’S WELL

                     
SERVICE CO., GENERAL PARTNER, Appellees



 

                                  
On Appeal from the 358th District Court

 

                                                            
Ector County, Texas

 

                                                 
Trial Court Cause No. D-125,961

 



 

                                                                 
O P I N I O N

                                                                             


           
In this interlocutory appeal, Superior Energy Services, Inc. (Superior) and
SESI, LLC (SESI) appeal the trial court’s orders overruling their special
appearance motions.  The record demonstrates that both companies have the
requisite contacts with Texas and that jurisdiction over them in the underlying
suit would not violate constitutional guarantees of substantive due
process.  We affirm.


 

Background

Brian Shoemaker was a limited partner in and manager of Sonic
Petroleum Services, Ltd., whose principal place of business is in Odessa. 
Sonic furnishes specialized rental equipment and tools to the oil and gas
industry in West Texas.  The general partner of Sonic is Lonnie’s Well
Service Co.; both parties will be referred to as Sonic.

According to its annual report, Superior manufactures, sells,
and rents specialized equipment used in offshore and onshore oil and gas
drilling.  One of Superior’s four business segments is its rental tool
segment.  Superior’s rental tool segment has locations in “all of the
major staging points in Louisiana and Texas for oil and gas activities.” 
Blowout Tools, Inc. (BTI) is a subsidiary of Wild Well Control, Inc. (Wild
Well); BTI and Wild Well are part of the rental tool segment.  Wild Well
is a subsidiary of SESI, which is owned by Superior.  Superior also owns a
subsidiary named Superior Energy Services, L.L.C., that has extensive
operations in Texas.

BTI, Wild Well, Superior, and SESI wanted to expand BTI’s and
Wild Well’s oilfield equipment rental business in West Texas.  Westy Ballard,
an employee of SESI, called Jackie Manning to see if the partners of Sonic had
an interest in selling Sonic.  After Manning indicated they had no
interest, BTI hired Shoemaker.  Superior funded the new business with $3.6
million.

In the underlying lawsuit to this appeal, Sonic sued
Shoemaker, BTI, Wild Well, SESI, Superior Energy Services, L.L.C., and
Superior.  Superior and SESI entered special appearances, which, after an
evidentiary hearing, were overruled by the trial court.  In this appeal,
Superior and SESI argue that the only rationale for exercising jurisdiction
over a parent corporation is if the parent corporation exercises such control
and dominance over its subsidiary that they are in reality one and the same
corporation for purposes of jurisdiction.  BMC Software Belgium,
N.V. v. Marchand, 83 S.W.3d 789, 798 (Tex. 2002).  Relying on
that principle, Superior and SESI argue that there is no evidence that Superior
and SESI exercise such control and dominance over BTI and Wild Well.

Sonic contends that the control argument made by Superior and
SESI is not relevant.  Sonic asserts that its claims against Superior and
SESI are based on their own operations in Texas and their actions in
facilitating Shoemaker’s alleged breach of his partnership agreement with Sonic
and his breach of fiduciary duties to Sonic.  Sonic also asserts claims
against Superior and SESI for tortious interference with contract and business
relations, for misappropriation and theft of trade secrets and proprietary
business information, for unjust enrichment, and for liability as principals
and being part of a conspiracy.

Law

Texas courts have personal jurisdiction over a nonresident
defendant when (1) the Texas long-arm statute provides for it and (2) the
exercise of jurisdiction is consistent with federal and state due process
guarantees.  Spir Star Ag v. Kimich, 310 S.W.3d 868, 872 (Tex.
2010); Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806
(Tex. 2002).  The long-arm statute reaches “as far as the federal constitutional
requirements of due process will allow.”  Guardian Royal Exch.
Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex.
1991).

Personal jurisdiction over nonresident defendants is
constitutional only when (1) the defendant has established minimum contacts
with the forum state and (2) the exercise of jurisdiction comports with
traditional notions of fair play and substantial justice.  Int’l Shoe
Co. v. State of Washington, Office of Unemployment Comp. & Placement,
326 U.S. 310, 316 (1945).  A defendant’s contacts with a forum can give
rise to either specific or general jurisdiction.  Spir Star Ag, 310
S.W.3d at 872; CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996). 
General jurisdiction exists when a defendant’s contacts are continuous and
systematic, even if the cause of action did not arise from activities performed
in the forum state.  Specific jurisdiction exists when the alleged
liability arises from or is related to the defendant’s activities conducted
within the forum.  CSR Ltd., 925 S.W.2d at 595.

The trial court held an evidentiary hearing on the special
appearance motions of Superior and SESI.  Because the trial court made no
findings in this case, all facts necessary to support the trial court’s
judgment are implied.  Worford v. Stamper, 801 S.W.2d 108, 109
(Tex. 1990).  Superior and SESI have challenged the sufficiency of the
evidence; therefore, the standard of review to be applied is the same as that
to be applied in the review of jury findings or a trial court’s findings of
fact.  Daimler-Benz Aktiengesellschaft v. Olson, 21 S.W.3d 707, 715
(Tex. App.—Austin 2000, pet. dism’d w.o.j.).

                                                                 
Issue on Appeal

           
Superior and SESI’s issue on appeal is whether the trial court erred by
overruling their special appearances.  Superior and SESI then break that
issue down into sub-issues, e.g., whether Sonic met its burden of pleading
specific jurisdictional facts that support either specific or general jurisdiction
over Superior and SESI.  The sub-issues will be addressed in our
discussion of the principal issue.

Analysis

Sonic pleaded that Superior and SESI purposefully availed
themselves of the privileges and benefits of conducting business in Texas by
engaging in business in Texas; marketing their services and that of their
subsidiaries in Texas through the website www.superiorenergy.com;  recruiting employees through that
website; providing funding to subsidiary companies in Texas for the purposes of
expansion, capital expenditures, etc.; having officers in Texas (e.g., Patrick
Campbell, executive vice president, Technical Solutions Group, Superior Energy
Services, Inc., 2202 Oil Center Court, Houston, Texas); having their officers
and employees assist subsidiary companies with the potential purchase of Sonic;
and having their officers and employees assist with (a) the recruiting of
Shoemaker from Sonic and (b) the formation and development of BTI’s Odessa
branch with Sonic’s proprietary and confidential information, which was done
tortiously and for which Sonic sued.

           
Sonic’s pleadings relate in detail its version of how SESI contacted a Sonic
partner to see if Sonic could be acquired and, having been rebuffed, Superior
and SESI then chose to start and fund with $3.6 million dollars a new venture
in West Texas to compete with Sonic by recruiting Shoemaker and his team to
BTI.  Sonic alleges that those actions caused Shoemaker to breach his
fiduciary duty to Sonic; to breach his limited partnership agreement with
Sonic; and to misappropriate and take trade secrets, key employees, and
proprietary business information with him.  Sonic’s pleadings contained
sufficient jurisdictional facts to support specific or general jurisdiction
over Superior and SESI.  Superior and SESI were entitled to challenge
those pleadings, and they did by their special appearance. 

           
In support of its special appearance motion and to rebut Sonic’s allegations,
Superior filed an affidavit by Danny Young, Superior’s executive vice president
of corporate services.   Young stated in his affidavit that Superior
was a “completely separate and distinct corporate entity from each of its
subsidiaries” and that it did not exert domination or control over any of its
subsidiaries, including Wild Well and BTI.  He further stated that
Superior had no officers or directors based in Texas until 2009 when Campbell
became the executive vice president of Technical Solutions for Superior, that
Campbell was an employee of SESI – not Superior, and that Superior’s website
was not interactive.  Finally, Young stated that Superior was not a
resident of Texas and conducted no business in Texas.

           
In objecting to jurisdiction by a Texas court, SESI also emphasized that it did
not exert control and dominance over its subsidiaries in Texas.  SESI
attached the affidavit of William B. Masters, executive vice president and
general counsel of Superior.  He stated that SESI was only qualified to do
business in Delaware and Louisiana; that SESI was a completely separate and
distinct corporate entity from each subsidiary; that it did not exert
domination or control over any subsidiary, including Wild Well or BTI; and that
SESI and its subsidiaries shared very few corporate services that are provided
by SESI, a wholly owned subsidiary of Superior.  Those services were
certain benefits such as the 401(k) plan, insurance, cash management, and to a
limited extent legal and human resources support services.

Masters also stated that Campbell was an executive vice
president of technical solutions for Superior and an employee of SESI and that
Campbell resided in Texas; therefore, Masters acknowledged that SESI was “amenable
to service and jurisdiction in Texas.”[1]
 He then added, “Patrick Campbell, however, did not become an employee of
SESI, LLC until the early part of 2009 which was well after this lawsuit arose
and well after BTI and Wild Well Control were sued.”  Masters acknowledged
that Westy Ballard, a vice president and employee of SESI, had a short
conversation with Manning of Sonic on August 20, 2007.  Masters also
stated that Ballard had never spoken to Shoemaker and that “Ballard did not
travel to Texas to meet with anyone associated with Plaintiff.  His
contact was merely by phone to determine whether or not there was a possibility
of Superior acquiring Sonic.”

           
As noted in Michiana Easy Livin’ Country, Inc. v. Holten, 168 S.W.3d 777
(Tex. 2005), the touchstone of jurisdictional due process has been “purposeful
availment.”  Id. at 784.  It is only the defendant’s contacts
with the forum that count.  Purposeful availment “ensures that a defendant
will not be haled into a jurisdiction solely as a result of . . . the
‘unilateral activity of another party or a third person.’”  Burger King
Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985).  Second, the acts relied
on must be “purposeful” rather than fortuitous.  Id.  Third, a
defendant must seek some benefit, advantage, or profit by “availing” itself of
the jurisdiction.  Michiana Easy Livin’ Country, 168 S.W.3d at 785.

Factors Supporting General Jurisdiction

           
We need not discuss whether the affidavits of Young and Masters were sufficient
to negate Sonic’s pleadings.  Sonic introduced unrebutted evidence
supporting its pleading allegations that Superior and SESI have had enough
contacts with Texas to support a holding that the Texas court had general and specific
jurisdiction over them.  On appeal, we consider all of the evidence before
the trial court on the question of jurisdiction.  Fish v. Tandy Corp.,
948 S.W.2d 886, 891 (Tex. App.—Fort Worth 1997, writ denied).

General jurisdiction may be asserted when the cause of action
does not arise from or relate to the nonresident defendant’s purposeful conduct
within the forum state but when there are continuous and systematic contacts
between the nonresident defendant and the forum state.  Helicopteros
Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16 (1984).

Sonic introduced copies of Superior’s 2008 annual report,
Form 10-K filed with the Securities and Exchange Commission, portions of
depositions, and organizational charts and other information from Superior’s website. 
In the Form 10-K, Superior states under “Facilities”: “We also own certain
facilities and lease other office, service and assembly facilities under
various operating leases, including a 7-acre office and training facility
located in Houston, Texas.”  Under the description of its business, the
discussion is in terms of Superior being one company.  For example, there
is the statement:  “We believe we are a leading provider of rental
tools.  We manufacture, sell and rent specialized equipment for use with
offshore and onshore oil and gas well drilling, completion, production and
workover activities.”  This statement is typical of the description of
Superior’s business.  Exhibits to the Form 10-K include “Exhibit 21.1
Subsidiaries of the Company”; however, this exhibit is not included in the
record.

           
In its annual report, Superior states:  “Through the Power of One, we . .
. deliver and execute solutions as one seamless unit operating under one common
culture.”  The annual report also states:  “We also own . . . a
7-acre office and training facility located in Houston, Texas.” Superior and
SESI argue that Superior’s annual report was drafted pursuant to the Securities
and Exchange Commission’s Regulation S-K.  Our special-appearance jurisprudence
dictates that the plaintiff and defendant bear shifting burdens of proof in a
challenge to personal jurisdiction.  Kelly v. Gen. Interior Constr.,
Inc., 301 S.W.3d 653, 658 (Tex. 2010).  Superior and SESI introduced
no evidence to rebut Superior’s statement that it owned a seven-acre office and
training facility in Texas.  

           
Statements in annual reports and Form 10-Ks are pertinent evidence.  In
denying Daimler-Benz’s special appearance motion in Olson, the Austin
Court of Appeals noted their importance:

In Daimler-Benz’s annual shareholder reports from 1990
through 1995, management’s business review consistently discussed sales of
Mercedes-Benz cars in the U.S. in terms of “our” sales and the number of cars
“we sold.”  

 

           
. . . .

 

[W]hile formally separate, Daimler-Benz and [Mercedes Benz
of North America] form a functional whole in promoting and marketing vehicles
in Texas.

 

Olson, 21
S.W.3d at 722, 723.

 

           
In the record before us, Superior projected that it and its companies and
divisions were a functional whole in promoting and marketing equipment and
services to the oil and gas industry in Texas.  In Olson, the court
was engaged in jurisdictional veil-piercing that involved Daimler-Benz
Aktiengesellschaft, the parent corporation in Germany, and Mercedes-Benz of
North America, the sole importer and distributor in the United States of
Mercedes-Benz cars and parts.  Aside from the question of jurisdictional
veil-piercing between BTI (and other subsidiary corporations) and Superior, we
are also trying to determine the direct contacts that Superior and SESI have
had with Texas.  Campbell testified that Superior has internal divisions,
and the chart on Superior’s website so indicates.  Superior’s references
to “we” supported an interpretation by the trial court that an internal
division of Superior owned seven acres and an office in Texas.

           
Sonic joined Superior and SESI as defendants in May 2009.  Sonic points
out that Campbell testified that he became an executive vice president of
Superior in April 2009 and an employee of SESI in early 2009.  Prior to
that, he was the president and chief executive officer of Wild Well and
reported to James Holleman, an executive vice president of Superior.  The
new president of Wild Well now reports to Campbell.  Superior and Sonic
admit that Campbell is an officer of Superior, an employee of SESI, resides in
Texas, and has an office in Houston.  His business card indicates that
Superior has an office at 2202 Oil Center Court in Houston. Wild Well’s
principal offices are also at that address.  The “Engineering &
Project Management” division of Superior is also located at 2202 Oil Center
Court.

           
Superior and SESI argue that Campbell did not become an officer of Superior and
an employee of SESI until after the filing of the suit by Sonic; therefore,
these factors did not subject Superior and SESI to the Texas court’s
jurisdiction.  They rely on PHC-Minden, L.P. v. Kimberly-Clark Corp.,
235 S.W.3d 163 (Tex. 2007), for their position.

           
PHC-Minden involved the issue of general jurisdiction, and the general
jurisdiction analysis is dispute-blind.  Campbell’s activities and
representations of Superior and SESI in Texas were contacts of Superior and
SESI with Texas for purposes of general jurisdiction.  By placing an
active executive vice president in Texas, Superior has availed itself of the
benefits of operating in Texas.  But there are two problems.  The
record reflects that Campbell’s activities as an officer and employee of
Superior and SESI were not over a substantial period before Sonic served notice
of the lawsuit against Superior by serving Campbell.  Secondly, Superior
and SESI may be correct that the time this suit was filed was when it was first
filed against Shoemaker and the others.    

It is noteworthy that Campbell testified that Superior had a
number of subsidiary companies, some of which were divisions of Superior:

A:  Well Superior has a broad
variety of subsidiary companies and some which are part and parcel of Superior,
not – not regarded as a separate subsidiary, if you will.

 

Q:  Might have internal
divisions?

 

A:  Correct.

 

           
A division of a corporation is not a separate legal entity but is the
corporation itself.  W. Beef, Inc. v. Compton Inv. Co., 611
F.2d 587, 591 (5th Cir. 1980).  Sonic introduced an organizational chart
of Superior that appears on its website.  That chart on the left-hand side
lists the organizations of Superior under the label
“Division/Department.”  A division may be considered to be an internal
division of a corporation (such as Superior) or a division might consist of a
group of separate subsidiary companies.  The trial court could have
reasonably considered “division” to mean internal divisions of Superior based
on Campbell’s testimony.  Reading Superior’s annual report and Form 10-K
leads one to conclude that Superior wanted the reader to consider Superior as
an integrated company whether the particular operation was a division of the
parent, a separate subsidiary corporation, or a division of a subsidiary
corporation.  

In the chart from the website, one “Division/Department” is
named “Superior Energy Services” with a sales office at 11000 Equity Drive in
Houston and engineering and project management at 2202 Oil Center Court in
Houston.  There is a “Division/Department” named “H B Rentals” that
has employees located in Alice, Alvord, Fairfield, Liverpool, Midland, and
Houston, Texas.  A “Division/Department” named “Stabil Drill” has employee
locations in Corpus Christi, Houston, and Midland.  A
“Division/Department” named “Sub Surface Tools” has employee locations in
Bridgeport and Corpus Christi.  Under the “Division/Department” named
“Superior Energy Services,” there are employee locations at Houston,
Brookshire, Longview, and Alvin.  “Superior Energy Services” could refer
to Superior Energy Services, Inc. or Superior Energy Services, L.L.C., or
both.  A “Division/Department” named “Warrior Energy Services” has
employees in Longview, Odessa, Decatur, Victoria, Rosharon, Tyler, Houston,
Corpus Christi, and Cleburne.  Wild Well, a defendant in this case, is
listed as a “Division/Department.”  There is no indication that it is a
corporation, but there is evidence elsewhere in the record that it is.
 However, the listing of one corporation under “Division/Department” does
not lead to a conclusion that all the “Division/Departments” are corporations.

Superior and SESI could have introduced an organizational
chart with testimony by an officer that explained whether “division” in the
chart included internal divisions.  They did not.

           
Sonic attempted to learn about the structure of Superior by taking the
deposition of Westy Ballard, vice president of corporate development of
SESI.  One would normally think that the vice president of corporate
development of a company would know the corporate structure of the
company.  Yet, Ballard stated flatly that he did not know the
organizational structure of Superior or its family of companies even though he
also stated that he was “responsible for sourcing, analyzing and executing
mergers, acquisitions, and strategic alliances.”  Ballard testified that
his supervisor was Guy Cook who was the executive vice president of rental
tools, a division that rents drilling-related rental tools.  Ballard was
then asked the following:

Q.  When you say [Cook is] an
executive vice president of a division within our company, which company are
you speaking of?

 

A.   I don’t know. 
I mean, I know that he’s employed, his office is next to mine, but I don’t know
what company he’s an employee of or the rental tool division is under what
company.  I don’t know.

 

Superior’s
website lists Guy Cook as executive vice president, rental tools of Superior.

           
In the conclusion to its special appearance motion, Superior gave two reasons
in support of its motion: (1) Superior does not exert dominance over its
subsidiaries and (2) Superior’s website is passive.  In his affidavit, Young
stated that Superior had no officers or directors based in Texas until Campbell
became an officer of Superior and an employee of SESI.  He does not state
that Superior had no employees or internal divisions in Texas.  Young did
state that Superior “conducts no business” in Texas.  The evidence of
Sonic was to the contrary, and Superior had the burden to explain and rebut
that evidence.  The trial court was entitled to believe Sonic.

In their reply brief, Superior and Sonic argue that, even
though the Superior annual report states: “We also own . . . a 7-acre office
and training facility located in Houston, Texas,” Superior does not “own”
property in Texas.  They cite to Young’s affidavit as evidence that
Superior “owns no property” in Texas.  Nowhere in Young’s affidavit does
he state that Superior does not “own” property in Texas, nor did Young state
that Superior did not “lease” property in Texas.   Young did state
that Superior “is not a resident of the State of Texas,” but that was simply a
statement that Superior was a nonresident.  The issue is whether that
nonresident had meaningful contacts with Texas.

           
In his affidavit, Masters also concentrates on how separate SESI is from each
of its subsidiaries and that they share corporate services to a limited
extent.  SESI also had the burden to explain and rebut Sonic’s evidence.

           
In Superior and SESI’s brief, they state that “Superior has no offices in
Texas, no employees in Texas and no bank accounts in Texas.  It has never
owned, leased, rented or controlled real property in Texas and has never paid
taxes in Texas.”  Superior and SESI cite Young’s affidavit for these
statements.  Young’s affidavit does not support these statements.

           
Given the record before this court, it is easy to be confused about Superior
and its subsidiaries.  In their statement of the case, Superior and SESI
stated that Superior Energy Services, Inc. and Superior Energy Services,
L.L.C., although having similar names, are separate and distinct corporate
entities from one another.  According to Superior and SESI, Superior
Energy Services, L.L.C. is a direct subsidiary of SESI, LLC and an indirect
subsidiary of Superior Energy Services, Inc.  Appellants refer to the
clerk’s record at page 141 as the evidence for that statement.  The chart
on page 141 is confusing.  There is a Superior Energy Services, L.L.C.,
but under that name is a note “Disregarded Entity.”  It took a magnifying
glass to discern that note.  Of the thirty-three entities that appear to be
owned by SESI, L.L.C., a number have the note “disregarded entity,” some have
the note “partnership,” some “foreign corporation,” some “corporation,” and
some have no note below the name.

           
Superior’s annual report, Form 10-K, website, and the employment forms signed
by Shoemaker lead one to the logical conclusion that Superior desires to be
thought of as an integrated whole by investors, employees, and anyone
else.  After the introduction of Sonic’s evidence without evidence to the
contrary, we cannot say that the trial court erred. 

           
Sonic’s evidence was legally and factually sufficient to support implied
findings by the trial court that Superior and SESI had and have substantial
activities in Texas that are continuous and systematic, aside from specific
activities by Superior and SESI that relate to this litigation.  Superior
and SESI had the burden of negating all jurisdictional bases.  BMC
Software Belgium, 83 S.W.3d at 793-94; Kawasaki Steel Corp. v. Middleton,
699 S.W.2d 199, 203 (Tex. 1985).  Contrary to the argument of Superior and
SESI, Sonic did not have to show exertion of dominance or control of BTI and
Wild Well given the evidence it introduced at the hearing.  We hold that,
based on the record before us, there was evidence of sufficient contacts with
Texas for the trial court to hold that it had general jurisdiction over
Superior and Sonic.

Specific Jurisdiction

           
Specific jurisdiction is established if the defendant’s alleged liability
arises from or is related to an activity conducted within the forum.  BMC
Software Belgium, 83 S.W.3d at 796; Guardian Royal, 815 S.W.2d at
228.  Again, we must presume that all factual disputes were resolved in
favor of the trial court’s ruling.  Spir Star AG, 310 S.W.3d at
871-72.  All facts necessary to support the judgment and supported by the
evidence are implied.  BMC Software Belgium, 83 S.W.3d at
795.

           
Sonic alleged and presented evidence that officers and employees of Superior
and SESI were involved in the alleged torts involved in hiring Shoemaker. 
As stated earlier, Texas courts may exercise personal jurisdiction over a
nonresident defendant if (1) the Texas long-arm statute permits the exercise of
jurisdiction and (2) the assertion of jurisdiction is consistent with federal
and state constitutional due process guarantees.  Kelly, 301 S.W.3d
at 657; Moki Mac River Expeditions v. Drugg, 221 S.W.3d 569, 574 (Tex.
2007).  The long-arm statute provides a nonexclusive list of what
constitutes “doing business” in Texas, including (1) contracting with a Texas
resident and either party is required to perform the contract in whole or in
part in Texas; (2) committing a tort in Texas; or (3) recruiting Texas
residents for employment, both in and out of the state.  Tex. Civ. Prac. & Rem. Code Ann. §
17.042 (Vernon 2008); BMC Software Belgium, 83 S.W.3d at 795. 
Although the first one is not involved here, Sonic alleged and provided
evidence relating to the other two.

           
Texas has an interest in enforcing the provision of its long-arm statute that
specifically subjects nonresidents who recruit Texas residents to personal
jurisdiction in Texas.  Moreno v. Poverty Point Produce, Inc., 243
F.R.D. 265, 271 (S.D. Tex. 2007); see Gonsalez Moreno v. Milk Train,
Inc., 182 F. Supp. 2d 590, 594-95 (W.D. Tex. 2002) (jurisdiction proper
where defendant, through intermediary, recruited Texas residents to work in New
York and reimbursed their travel expenses).  Also in point is Innovative
Therapies, Inc. v. Kinetic Concepts, Inc., Nos. 04-09-00285-CV &
04-09-00286-CV, 2010 WL 1486502 (Tex. App.—San Antonio Apr. 14, 2010, pet.
filed), where the court held that the nonresident corporation, Innovative
Therapies, purposefully availed itself of benefits of conducting activities in
Texas where it employed the chief engineer of the Texas company, KCI.  

           
Sonic provided evidence that in the years 2006 and 2007, BTI, Wild Well,
Superior, and SESI were discussing how to expand Superior’s West Texas rental
tool operations.  The alternatives were (1) to acquire Sonic or (2) to
simply hire Shoemaker and his team away from Sonic, and Superior would then
fund their operation with $3.6 million.  Ballard of SESI made one
telephone call to Manning, a substantial owner of Sonic, to see if Sonic was
available for sale.  Ballard testified that Manning had no interest. 
Campbell testified that Ballard and Cook, an executive vice president of
Superior, advised him that Manning was not interested in selling Sonic.
 Because Manning evidenced little or no interest in a sale of Sonic,
Superior and SESI decided to hire and fund Shoemaker to expand their rental
tool business expansion into West Texas.

           
Steven Norris, general manager of BTI, testified that BTI was part of the Wild
Well  subsidiary division, but he did not know what type of entity BTI
was.  Bill Mahler is his immediate superior.  Norris and Shoemaker
had been friends for years and had stayed in touch; Norris knew Shoemaker was
the manager and had an interest in Sonic.  In 2006, Norris let Shoemaker
know that BTI would be interested in discussing an acquisition of Sonic or
employing Shoemaker, but at that time, Shoemaker was not interested. 
Campbell, president of Wild Well at the time, directed Norris to contact Pat
Bernard and Cook of Superior to discuss how to expand into West Texas. 
Norris testified that Bernard and Cook would come over periodically to the
Drilling Technology Center in Houston for discussions.  Norris told Bernard
and Cook that Shoemaker was a key person to expanding in West Texas:

That was one of the key things that
I pointed out to Pat Campbell and Pat Bernard and Guy Cook, that, you know, I
can go get equipment anywhere, but getting the right people that have the
knowledge and the professional influence to go out and make it successful is
key, and I told [them] I did not want to move too far ahead of time and lose
contact with Brian.

 

In
the early part of 2007, Shoemaker told Norris that he would have to talk to
Manning about any acquisition of Sonic.

           
Campbell testified that Bernard, senior executive vice president of Superior,
was involved in planning acquisitions and mergers.  According to Campbell,
Norris told the officers at Superior that $3.6 million would be required for a
West Texas expansion.  Campbell also confirmed that Bernard would meet
with them at the Drilling Technology Center in Houston.  In 2006, Bernard
was involved in discussions about acquiring Sonic or just expanding in West Texas.

Bill Mahler, executive vice president and general manager of
Wild Well, also testified.  Mahler was in charge of business development
during the time of the discussions.  He also did not know whether BTI was
a corporation.  He stated that Campbell was president of Wild Well and
general manager of BTI and that Norris subsequently came in as general manager
of BTI.  Mahler acknowledged that he was aware that Norris or Campbell had
asked Superior to approach Sonic about an acquisition.

There is an e-mail dated September 4, 2007, from Norris to
Campbell and others where Norris indicated that he had to get Superior’s
approval for an expenditure to fund the expansion into West Texas:

I have attached an 07/08 P & L
as well as a brief timetable of projected events that we need to move forward
with for W. Texas.  At this time Brian Shoemaker is ready to pull the
trigger to sever with SPS and come aboard.  I told him to hold off until
we had addressed the inventory capex we would be needing as well as a basic
business plan.  We have made contact with various vendors and gotten
pricing as needed for AFE generation to purchase.  [Shoemaker] is awaiting
our call to move on his end.

 

This
e-mail indicates that Superior’s $3.6 million funding was critical to the
hiring of Shoemaker.

           
On September 5, 2007, Wild Well and BTI submitted their principal request for
capital from Superior for the “West Texas Location Start-Up Inventory/Rental
Assets.”  It appears that Shoemaker was hired on September 12, 2007. 
Apparently, Superior and SESI approved the expansion funding some time between
September 5 and 12, although their officers had discussed the amount with
Norris at an earlier date.  Based on the record, the trial court could
have reasonably found that, without the funding, Shoemaker would not have been
hired and would not have been accused of having breached his contract with and
fiduciary duty to Sonic.  

           
It was not necessary for Sonic to show that Superior and SESI controlled Wild
Well and BTI.  Our focus is on the role of Superior and SESI in the hiring
of Shoemaker.  Although Ballard’s telephone call to Manning by itself
would not constitute a sufficient contact for jurisdiction by the trial court,
it is one additional factor to be considered in the role of Superior and SESI
in the hiring of Shoemaker and some of his team.  The discussions in
Houston involving Bernard and Cook of Superior (and SESI) and the $3.6 million
funding are additional factors.  

           
A purposeful availment analysis considers (1) only the conduct of the
nonresident defendant; (2) whether the defendant’s contacts with the forum were
purposeful, rather than random, fortuitous, or attenuated; and (3) whether the
defendant sought a benefit, advantage, or profit by availing itself of the
jurisdiction.  Moki Mac, 221 S.W.3d at 575.  Thus, we focus on
the nature and quality of Superior’s and SESI’s contacts with Texas, not the
number of contacts.  Retamco Operating, Inc. v. Republic Drilling Co.,
278 S.W.3d 333, 337 (Tex. 2009).  The nonresident’s activities, whether
they consist of direct acts within Texas or conduct outside Texas, must justify
a conclusion that the defendant could reasonably anticipate being called into a
Texas court.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286,
297 (1980); BMC Software Belgium, 83 S.W.3d at 795.

           
Norris told Bernard and Cook that Shoemaker was a key person to expanding
Superior’s operations through BTI in West Texas.  Both Norris and Campbell
testified that Bernard of Superior would meet with them at the Drilling
Technology Center in Houston and that the discussions concerned whether to
acquire Sonic or to have Superior fund an entity to expand in West Texas. 
Norris told the officers at Superior, who were employees of SESI, that $3.6
million would be required for the West Texas expansion.  Mahler of Wild
Well said that he was aware that Norris or Campbell had asked Superior to
approach Sonic about being acquired.

           
Bernard and Cook of Superior and SESI were involved in the discussions at the
Drilling Technology Center in Houston concerning how to expand their rental
tool business in West Texas.  They must have been aware that, by choosing
the manager of their principal competitor, Shoemaker, in West Texas, to take
away Sonic’s market share, they would risk litigation with Sonic.  That
litigation should have been expected when they funded Shoemaker with the $3.6
million to compete with his former company, Sonic.  Innovative
Therapies, 2010 WL 1486502, at *12; see Nogle & Black Aviation, Inc.
v. Faveretto, 290 S.W.3d 277, 283-85 (Tex. App.—Houston [14th Dist.] 2009,
no pet.); see also GJP, Inc. v. Ghosh, 251 S.W.3d 854, 880 (Tex.
App.—Austin 2008, no pet.).

           
In an e-mail dated September 11, 2007, Campbell advised James Holleman,
executive vice president of Superior, and Kenny Crockett, who worked for
Holleman at Superior, that Shoemaker was already bringing in the business:

We have just hired Brian Shoemaker,
and he is already bringing in some business. . . .

 

There is a possibility that the
current owner of [Sonic] (privately held) will change his position about
selling when he sees that the business will not succeed and grow without the
very good team that Brian had assembled. . . .

 

. . .  [Sonic] has averaged
over $800K per month for the last five months, $600K - $800K during the last
half of 2006.

 

           
It appears that, in addition to Bernard and Cook, Holleman and Crockett had
some involvement in the decision to target Shoemaker and his team and fund them
to compete against Sonic in the rental tool business in West Texas.  When
a tortfeasor commits a tort in the forum state by directing its actions toward
the forum state with full knowledge that injury will occur in the forum state,
jurisdiction is appropriate.  See Wien Air Alaska, Inc. v. Brandt,
195 F.3d 208, 211 (5th Cir. 1999); see Mem’l Hosp. Sys. v. Fisher Ins.
Agency, Inc., 835 S.W.2d 645, 650-52 (Tex. App.—Houston [14th Dist.]
1992, no writ) (holding that a single phone call was sufficiently purposeful to
support jurisdiction).  The minimum-contacts analysis is focused on the
quality and nature of the defendant’s contacts, rather than their number. 
Republic Drilling, 278 S.W.3d at 339.

           
Superior’s and SESI’s contacts with Texas demonstrate that they purposefully
availed themselves of the privilege of conducting activities in Texas. 
There is legally and factually sufficient evidence to demonstrate that they
purposefully “availed” themselves of the benefits of Texas by participating in
the targeting and recruiting of Shoemaker and his team to build Superior’s (or
an entity owned by Superior) market share in West Texas.  The cause of
action arose from those contacts.  See Coleman, 83 S.W.3d at 806.

The Exercise of Jurisdiction Must Comport With

 the Notions of  Fair Play and Substantial
Justice

 

           
Having determined that Superior and SESI had minimum contacts with Texas
sufficient to support general and specific jurisdiction, we now face the issue
of whether subjecting them to the jurisdiction of Texas would offend
traditional notions of fair play and substantial justice.  Innovative
Therapies, Inc., 2010 WL 1486502, at * 11; Republic Drilling, 278
S.W.3d at 341.

           
To determine this issue, we consider (1) the burden on the defendants, (2) the
interests of the forum state in adjudicating the dispute, (3) the plaintiff’s
interest in obtaining relief, (4) the interstate justice system’s interest in
obtaining the most efficient resolution of controversies, and (5) the shared
interest of the several states in furthering fundamental substantive social
policies.  Asahi Metal Indus. Co. v. Superior Court of California,
Solano County, 480 U.S. 102, 113 (1987); Woodson, 444 U.S. at
292.  “Only in rare cases, however, will the exercise of jurisdiction not
comport with fair play and substantial justice when the nonresident defendant
has purposefully established minimum contacts with the forum state.”  Spir
Star AG, 310 S.W.3d at 878.

           
The burden on Superior and SESI would be light.  Campbell is an executive
vice president of Superior and an employee of SESI.  He resides in Houston
and offices at 2202 Oil Center Court in Houston.  An engineering and
product management division of Superior is also located at 2202 Oil Center
Court.  From the record, it appears that officers of Superior and SESI
routinely visit Houston and other parts of Texas to check on their subsidiary
companies and divisions.  

           
A Texas resident was recruited to join the Superior team.  Sonic seeks
relief for Shoemaker’s leaving with his knowledge of Sonic.  The second
two factors are met.  From the interstate justice system’s viewpoint,
Texas is the most efficient forum for resolving this controversy. 
Although Superior and SESI have their headquarters in Louisiana, nearly all the
activities and events relating to this controversy occurred in Texas. 
Exercise of jurisdiction over Superior and SESI does not offend the notions of
fair play and substantial justice.  Superior and SESI’s issue on appeal is
overruled.

This Court’s Ruling

           
The judgment of the trial court is affirmed.

 

 

           
           
                                                                       
TERRY McCALL

                                   
                                                           
JUSTICE

 

November
4, 2010

Panel consists
of:  Wright, C.J.,

McCall, J., and
Strange, J.














[1]Campbell was also an agent of Superior for purposes of
service.  Tex. Bus. Org. Code Ann.
§ 5.255 (Vernon Pamph. 2010).